# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JENNIE O'BRYAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00153** |
| | ) | **Judge Aleta A. Trauger** |
| **US BANK NATIONAL ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendant US Bank National Association ("US Bank"). (Doc. No. 95.) For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.      PROCEDURAL HISTORY

This lawsuit arises out of plaintiff Jennie O'Bryan's termination from her employment at US Bank after a tenure of approximately thirty-four years. She filed suit in February 2020, asserting claims of discrimination and retaliation on the basis of age and sex, in violation of the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* The court thereafter granted in part and denied in part US Bank's Motion to Dismiss, finding that some claims were time-barred. (Doc. No. 28.)

US Bank has now filed its Motion for Summary Judgment, Memorandum of Law, Statement of Undisputed Material Facts, and numerous exhibits in support of its position that it is entitled to judgment as a matter of law on the remaining claims. (Doc. Nos. 95, 95-1 through 95-8, 96, 97.) The plaintiff has filed a Response, Amended Response to the Statement of Undisputed

Facts, her additional Statement of Disputed Material Facts, and her own evidentiary materials. (Doc. Nos. 103, 105, 106-1 through 106-15, 114.) In her response documents, the plaintiff expressly abandons her Title VII claim for discrimination on the basis of sex, leaving for resolution her claims for discrimination and retaliation in violation of the ADEA, and retaliation in violation of Title VII. (*See* Doc. No. 103, at 1 n.1; Doc. No. 114, at 3, Resp. to Statement No. 7.) The defendant filed a Reply and a Response to the plaintiff's Statement of Disputed Material Facts. (Doc. Nos. 115, 116.)

## II.   FACTS[1]

O'Bryan was employed by US Bank from 1984 until her termination on November 8, 2018.[2] She was fifty-two years old when she was terminated. She had been promoted a number of times over the years and held the position of Regional Manager/Vice President in the Wealth

---

[1] The facts for which no citation is provided are drawn from the plaintiff's Amended Response to US Bank's Statement of Undisputed Material Facts (Doc. No. 114) and the defendant's Response to the plaintiff's Statement of Disputed Facts (Doc. No. 116). The facts are either undisputed or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

[2] The plaintiff's Statement of Disputed Material Facts contains facts relating to O'Bryan's being passed over for a promotion to the position of Division Manager or, alternatively, Associate Division Manager in 2017, as alleged in her Complaint. (*See* Doc. No. 1 ¶¶ 38–39.) She alleges that she was not given a fair opportunity to be considered for the Division Manager position and was never even allowed to interview for the Associate Division Manager position. The company announced in April 2017 that it would not fill the Division Manager position and that it had hired Faith Tupman as Associate Division Manager. (*Id.* ¶¶ 40–41.) To the extent the plaintiff is continuing to pursue a discrimination claim or a Title VII retaliation claim based on this failure to promote in April 2017, any such claim is time-barred (as the court already held in ruling on the defendant's Motion to Dismiss, *see* Memorandum and Order, Doc. Nos. 27, 28), because the plaintiff's EEOC charge was filed on December 17, 2018, more than 300 days after the alleged failure to promote. (*See* Doc. No. 14-1.) Moreover, in responding to the Motion to Dismiss, the plaintiff purported to clarify her pleading by stating that her discrimination and retaliation claims are based on her termination, not on any failure to promote. (*See* Doc. No. 21, at 2 ("Plaintiff's Complaint is clear that the Defendant discriminated against her by wrongfully and unlawfully terminating her after thirty-four (34) years of service based upon her age, and by retaliating against her for engaging in protected conduct.").) Because the facts relating to the 2017 failure to promote are not material, regardless of whether they are disputed, the court has not included them in this recitation of the facts.

Management Group when she was terminated. Her supervisor at the time of her termination was Faith Tupman, who was forty-six years old. Tupman made the final decision to terminate O'Bryan for violation of the code of ethics as it related to workplace respect. (Tupman Dep. 10.) US Bank's written Code of Ethics and Business Conduct states that managers are responsible for "[u]nderstanding and complying with [the] Code of Ethics and Business Conduct," "[f]ollowing the letter and spirit of all . . . company policies and procedures," and "[t]reating employees . . . with respect." (Tupman Dep. Ex. 1, Doc. No. 95-2, at 53.)

### A. Allegations Relating to Title VII Retaliation Claim

The plaintiff alleges that, in October 2016, she complained to Human Resources Manager Kerry Hegna-Versluis (female, forty-eight years old), that she felt that her colleague Mike Martin[3] was treating her differently due to the fact that she was a woman, but Human Resources took no action on this complaint. Hegna-Versluis has no recollection and no written record of such a complaint. (Hegna-Versluis Dep. 140, 145.)[4] However, the defendant does not dispute, for purposes of its Motion for Summary Judgment, that the plaintiff made such a complaint.

### B. Allegations Relating to Age Discrimination and Retaliation

Faith Tupman was promoted to the position of Associate District Manager and became the plaintiff's direct supervisor in April 2017.[5] (Doc. No. 1 ¶ 45.) Tupman is six years younger

---

[3] At the time, O'Bryan and Martin were peers, both Regional Manager / Vice Presidents. She supervised the bankers in the Wealth Management Group while he supervised the wealth advisors. (Compl. ¶¶ 17, 19, 30.) They worked together for the purpose of "creat[ing] teams that would deliver a holistic client experience with banking and investments." (*Id.* ¶ 30.)

[4] The plaintiff purports to dispute this statement. (*See* Doc. No. 114, Resp. to ¶ 9 (citing to Hegna-Versluis Dep. Ex. 10.) The documentation to which she cites does not support her position. However, even if a dispute existed as to this point, it is not material.

[5] Mike Martin was also promoted to an Associate District Manager position at the same time and thus went from being the plaintiff's peer to a position one step above her. (Compl. ¶ 46.)

than O'Bryan. (O'Bryan Decl. ¶ 16.) She resided in Northern Kentucky. (Tupman Dep. 63.) She traveled the territory and only saw O'Bryan in person on occasion. (O'Bryan Decl. ¶ 22.)

O'Bryan claims that, shortly after her promotion, Tupman soon began making "ageist" comments to her. More specifically, in approximately the spring of 2018 while she was on a visit to Nashville, Tupman was sitting with O'Bryan in the plaintiff's office in Nashville when she told O'Bryan that her wire-rimmed glasses "made [her] look old" or "like an old lady" and that she "need[ed] to get with the times." (O'Bryan Dep. 78.) On Tupman's subsequent visit to Nashville, she told O'Bryan that she "really enjoyed" getting to know a couple of O'Bryan's team members, Derek and Angie, and that she "really felt good energy from the younger members of [O'Bryan's] team." (O'Bryan Dep. 80.) She described Derek as having "lots of energy. He's young." (*Id.* at 80–81.) At the same time, she advised O'Bryan, "If I were you, I would get with the younger crowd." (*Id.* at 80.) She continued, "if you want to be an old RM [Regional Manager], I don't think you'll last very long." (*Id.* at 80.) She told O'Bryan, "you're my old manager, an old RM. If you want to do bigger and brighter things, I suggest you get with the younger group and learn." (*Id.* at 81.) O'Bryan claims that, at that point, she began to understand that she was being treated differently because of her age. (*Id.*)

Shortly after that, in June or July 2018, the plaintiff was participating in a regular standing team call with Tupman and Tupman's direct reports, in which the group was talking about the implementation of some new software. Tupman commented that she was going to send Derek Arnold from Milwaukee to Nashville to "see if he could teach an old dog new tricks." (*Id.* at 81.) The plaintiff interpreted this statement to mean that Derek was "younger, he has more energy, he is more skilled than me and that she was sending him down to put that in my face." (*Id.* at 83.) Derek did eventually come to Nashville to teach O'Bryan the software; she did not

know whether he also taught others how to use it. (*Id.* at 84.)

  The plaintiff explained that the company normally did a mid-year review process as part of the managers' performance evaluation, where each manager's team members would "fill out a survey" about "how they viewed you, particularly, as their manager and how effective you were." (O'Bryan Dep. 79.) In April or May of 2018, Charla Ray informed the plaintiff that, because the plaintiff's territory had been split up after Tupman was hired, "it was just too much trouble and too hard to go back and try to figure out how to get feedback midyear from [O'Bryan] and from [Tupman], so . . . a decision had been made that they were just not going to do it for [O'Bryan]." (O'Bryan Dep. 79.) The plaintiff also explained that, because she had fewer than five direct reports at that time, and the feedback was supposed to be anonymous, "they would not give [her] the feedback" because it would be relatively easy to figure out who the comments were actually from. (*Id.* at 80.) The plaintiff provides this as an example of her being "treated differently": "I was told I wasn't getting the survey and I didn't." (*Id.* at 80.)

  She further claims that Tupman postponed providing her both her 2017 year-end evaluation and 2018 mid-year evaluation. (O'Bryan Decl. ¶ 23.) The plaintiff claims in her Declaration that, when Tupman finally provided a mid-year review, she allegedly gave the plaintiff "fraudulent performance numbers," thus "setting [her] up for negative performance markers at year-end, which would have negatively affected her income if she had not been terminated. (*Id.* ¶ 24.) In her deposition, however, the plaintiff stated only that the document Tupman shared with her was "incorrect." (O'Bryan Dep. 129.) She explained that she made corrections on the mistakes, particularly relating to her "rating," and shared her corrections with Tupman. (O'Bryan Dep. 130–31.) Tupman "literally forcefully yanked" the document from O'Bryan's hand, telling her she would "get it taken care of and send [O'Bryan] a corrected one."

(O'Bryan Dep. 131.) The plaintiff's insinuation that Tupman intentionally falsified the plaintiff's performance numbers is not supported by the record.

The plaintiff also claims that, in September 2018, Tupman brought up with her the fact that the plaintiff had applied for a mortgage for a vacation house. (O'Bryan Dep. 92–93.) The plaintiff told her that she did not apply to US Bank for a mortgage; she went to a different bank. Tupman accused her of getting a loan with US Bank for this house. The plaintiff explained that she had applied for a loan against her brokerage account to help with the down payment. Tupman told her that this transaction was being formally investigated as potential "incentive fraud." (O'Bryan Dep. 93.) O'Bryan protested that there was absolutely nothing wrong with what she had done and that it did not in any way violate company policy. (*Id.*) Tupman nonetheless maintained that O'Bryan was "in serious trouble," while the plaintiff continued to insist that any charge of fraud or policy violation was false. (*Id.* at 94.) The plaintiff testified that, even though Tupman told her a formal investigation had been initiated, no one from HR ever contacted her about it. The plaintiff speculated that, because of an incident involving Elza Milivic, another US Bank employee,[6] and her own complaint to HR, it "did not surprise [her] that [she] was not contacted" by HR. (*Id.* at 95.)

In any event, Tupman later required O'Bryan to "pull" her loan request from the branch in Nashville and to reapply with a banker in Cincinnati with whom she had never done business. (O'Bryan Dep. 119.) O'Bryan claims that this caused her unnecessary delay in obtaining funds and, in her opinion, was "discriminatory," because "men" in her "exact role" had done the same thing but were not required to go through what she did to obtain a loan. (O'Bryan Dep. 117, 119.) The plaintiff does not identify the ages of these men who were permitted to take out loans

---

[6] The plaintiff appears to be referring to a complaint made by Elza Milivic to HR about Mike Martin sometime after April 2017 and before November 2018. (O'Bryan Dep. 56–57.)

secured by their brokerage accounts. The plaintiff, again, has abandoned any claim based on sex discrimination.

On another occasion, Tupman chastised O'Bryan for using poor judgment in taking her entire team to an expensive restaurant for a "travel dinner" in Chicago. (O'Bryan Dep. 92.) Tupman also criticized the plaintiff for failing to implement a policy regarding which the plaintiff had not yet been informed and for missing deadlines that were contained in emails that were not sent to O'Bryan. (O'Bryan Dep. 88, 121–22.) Tupman's errors in both instances were apparently cleared up promptly. (*See id.*)[7] The plaintiff was never disciplined for any of these instances.

The plaintiff complained to Tupman that Tupman was treating her differently than younger employees. (O'Bryan Dep. 112, 126.) Tupman responded that O'Bryan was "exaggerating." (O'Bryan Dep. 112.) O'Bryan shared her dissatisfaction with Tupman's cancellation of meetings with her and, alternatively, arriving late or not at all. (O'Bryan Dep. 125.) Tupman told her she "had a big territory" and was "doing the best that she could." (O'Bryan Dep. 126.) The plaintiff estimated that she made this complaint to Tupman in the "July, August [2018] time frame." (O'Bryan Dep. 126–27.)

### C. O'Bryan's Altercation with Ryan Bly – US Bank's Version of Events

In October 2018, O'Bryan and others in US Bank's Wealth Management group, including Ryan Bly (male, age thirty-four), a financial advisor, attended US Bank's annual

---

[7] In her deposition, the plaintiff identifies most of these instances when she was wrongfully criticized by Tupman as supporting her claim that the company's failure to put her in the DM position was discriminatory (*see* O'Bryan Dep. 89–90), even though Tupman had nothing to do with the plaintiff's non-selection as DM, and aside from the facts that (1) the plaintiff has expressly disclaimed any discrimination claim based on her non-selection for the DM position and (2) as discussed above, any such claim is time-barred. She appears to rely on these events now in support of her claim that Tupman's decision to terminate her was discriminatory based on her age.

national sales conference in Scottsdale, Arizona. A verbal altercation between O'Bryan and Bly took place one evening of the conference, when the group was having drinks at the hotel after dinner.

According to contemporaneous notes taken by Human Resources Investigator Charla Ray (female, age fifty-two), Ray first learned of the incident when Bly's manager, Brian Venn, called her the morning of October 9, 2018 to relay what Bly had told him. (Doc. No. 95-6, at 7.) Based on Ray's notes, Venn's version is basically consistent with what Bly later told her, as discussed below. Ray told Venn she would call Bly. (*Id.*)

Ray spoke with Bly later the same day. (Doc. No. 95-6, at 3.) According to Ray's notes, Bly told her that he wanted to have a "professional discussion" with O'Bryan. He stated that O'Bryan told him, in front of the others, that he did not appear happy and asked whether he was having problems at home. Bly told O'Bryan that he did not want to discuss personal issues but admitted that he was dissatisfied with his job. When O'Bryan pressed him for details, Bly reportedly told her that he was not working well with his colleague, Elza Milivic. According to Bly, O'Bryan responded, "That's bullshit," and then accused Bly of refusing to come to work. (Doc. No. 95-6, at 4.) When he tried to explain that he had been out sick for several days, O'Bryan reportedly responded: "I've lost respect for you, you're a liar," and "you're full of shit." (*Id.* at 5.) When Bly suggested they discuss the matter some other time, O'Bryan asked him, "Why are you a broker-dealer? Why don't you go to another region?" (*Id.*) She then announced, "You're here because you fucked a banker," and told him, "If you're so unhappy, just go to another region & fuck another banker." (*Id.*)[8] At this point, Bly said to O'Bryan, "Fuck you,

---

[8] The defendant states that, at the time of the conference in Scottsdale, Bly had recently transferred from another territory due to a romantic relationship with a co-worker in that

Jennie." (*Id.*)

Bly also reported that O'Bryan texted him the following day to ask him to call her, and she then tried to call him twice the following Monday. Bly told Ray that he felt uncomfortable speaking to O'Bryan without a witness and therefore did not respond to her overtures. (*Id.*) He stated that he did not trust O'Bryan and felt that what she said was "very inappropriate" and "upsetting." (*Id.* at 6.)

Ray immediately initiated an investigation into Bly's complaint, which included interviews with O'Bryan, Kristi Straw, Reid Elsen, Faith Tupman, and Tupman's manager, Jonathan Miller.

Ray's notes from her October 11, 2018 telephone call with Kristi Straw indicate that Straw corroborated Bly's account of the incident. (Doc. No. 95-6, at 8.) Specifically, Straw told Ray that O'Bryan spoke to Bly in a condescending tone of voice, accused him of not meeting his goals and not coming to work, and eventually said "something along the lines of 'If you're so unhappy here, why don't you just move to another bank [and] you can fuck their bankers?'" (*Id.*) She also said that Bly responded by saying something like, "Jennie, fuck you – you don't get to talk to me like that." (*Id.*) Straw's deposition testimony was also basically consistent with the account of the event she had provided to Ray in October 2018. (Straw Dep. 81–85.) She described O'Bryan's behavior as "really uncalled for" and "out of line." (Straw Dep. 84.)

Ray's notes from her interview with Reid Elsen on October 16, 2018 indicate that Elsen told her he was not listening to the conversation between O'Bryan and Bly, though he did hear Bly "scream 'f-you, Jennie.'" (Doc. No. 95-6, at 10.) He also stated that O'Bryan "could have" used profanity "but he didn't hear it." (*Id.*) Elsen testified that, at the time he was deposed in

territory. (*See* Martin dep. 201–04, 206.) The plaintiff responds only that this is not a material fact. While it is not material, it does provide context for the plaintiff's alleged statement to Bly.

2021, he did not recall any specific details about the conversation, though he remembered Bly being "loud." (Elsen Dep. 33.) He agreed that, when he was interviewed shortly after the incident, he would have accurately reported whatever he had witnessed. (*Id.* at 34.)

Ray interviewed O'Bryan about the incident on October 15, 2018, informing her that she was "fact-finding" and that she wanted to give O'Bryan the "opportunity to share what happened." (Doc. No. 95-6, at 11.) According to Ray's notes, O'Bryan told her that,

> around 11 pm Ryan [Bly] and Kristi Straw were sitting together & she invited them to join her at another table. Jennie [O'Bryan], Ryan [Bly], Kristi [Straw] & Reid Elsen went to a smaller table. Ryan started talking about Elza [Milivic] – she & Ryan went back & forth about her. . . .
>
> Jennie asked Ryan – if it's this bad, why are you here? He responded by saying something else about Elza. Jennie stated that she probably didn't handle it well. Jennie said, "you (Ryan) didn't get the chance to pick a WMB." Then Kristi said – we all know why that happened.
>
> Ryan then said "F-you, Jennie." Jennie stated that she then grabbed her purse & left.

(Doc. No. 95-6, at 11.)

According to Ray's notes, O'Bryan also reported that she "felt terrible" the next day and tried to contact Bly, but he did not answer. (*Id.*) Asked to explain why she felt bad about the conversation, O'Bryan stated that it was because Bly was "not happy." (*Id.*) Asked specifically whether she told Bly he should "go somewhere else & fuck their bankers," O'Bryan denied making such a statement. (*Id.*) She could not specifically remember if she had otherwise used the "f-word" but noted that "it was midnight & all were drinking." (*Id.*) She stated that she only remembered telling Bly, "If you're so unhappy, why don't you go to another place." (*Id.*) She specifically remembered that Bly said "f-you Jennie," at which point she got up to leave. (*Id.*) Asked why people might report that O'Bryan used the "f-word" and had "brought up Ryan f'ing a banker," O'Bryan reportedly stated, "I don't know. I don't recall saying that. . . . [E]veryone

was drinking." (*Id.*) She told Ray that if she said that, she would tell her. She reiterated that she did not recall using profanity to Bly.

Ray reported that she asked O'Bryan again if she could remember more details about what she said. O'Bryan allegedly recalled saying "Why are you here? Are you happy?" but did not recall exactly what she had said or what Ryan said. She specifically remembered Bly "scream[ing]" "F-you." (*Id.* at 12.) Ray purportedly told O'Bryan that she was "having a hard time understanding how you recall several details about the conv[ersation] – different things people said – but you aren't able to recall whether or not you used the f-word or made a comment about f-ing another banker." (*Id.* at 12.) O'Bryan purportedly responded, "if I knew for sure, I would tell you." (*Id.*) According to Ray, O'Bryan "continued to state that she couldn't recall the details of what she said." (*Id.*) As discussed below, O'Bryan disputes this version of her conversation with Ray.

Ray had a telephone call with O'Bryan's supervisor, Faith Tupman, to discuss Bly's complaint. Even before Ray contacted her, Tupman had had lunch with O'Bryan when they were both in Kansas City, shortly after the incident at the sales conference in Scottsdale, Arizona. Tupman recalled that O'Bryan had told her during this meeting that she was "feeling good" about her relationship with Kristi Straw but alluded to things being "not so great" with Bly. (Tupman Dep. 166.) O'Bryan told her she had been trying to reach out to Bly to follow up on a conversation they had had at the conference, but she had not heard back from him. She recalled that O'Bryan told her the conversation related to his working relationship with Elza Milivic, with whom Straw had also had issues. (*Id.*) Tupman testified that O'Bryan did not tell her that she had had a verbal confrontation with Bly; Tupman learned about that later from Ray. (*Id.* at 170.)

Ray called Tupman shortly after Tupman's meeting with O'Bryan in Kansas City to

inform her about Bly's complaint against O'Bryan. According to Ray's notes, this conversation took place on October 12, 2018. (Doc. No. 95-6, at 13.) Tupman recalled telling Ray that she was surprised to hear what Ray shared, because the story she had heard from O'Bryan was "completely different." (Tupman Dep. 171.) Tupman testified that, after her conversation with Ray, she spoke with O'Bryan again on October 16, 2018. (Tupman Dep. 177.) According to Tupman, based on her contemporaneous notes, O'Bryan relayed to her at that time some issues with anxiety and medication and also that Ray thought she was not being truthful. (Tupman Dep. 177–78; *see also* Doc. No. 95-2, at 116.) Tupman encouraged O'Bryan to "trust the process." (Tupman Dep. 178.)

Tupman was in Nashville and met with O'Bryan again on November 7, 2018 to discuss Bly's complaint. Tupman testified that she asked O'Bryan to "walk [her] through what happened" from the beginning until the end. (Tupman Dep. 186.) Tupman recalled that O'Bryan told her she was having a "good dialogue" with Kristi Straw but that Ryan Bly "kept making comments about Elza." (Tupman Dep. 188.) O'Bryan was "trying to understand . . . where the comments are coming from," and she kept "asking him and asking him." (*Id.*) The conversation purportedly "got heated," and Tupman recalled that O'Bryan told her that Bly had "gotten up and kind of he was loud and . . . she said [he] bumped the table and stormed out." (*Id.*) Tupman noted that O'Bryan had not told her any of this when they had lunch in Kansas City shortly after the incident. (*Id.*)

O'Bryan also said she asked Bly "are you happy, why are you here?" and that she went "back and forth with him" about that. (Tupman Dep. 188; *see also* Doc. No. 95-2, at 117.) When Tupman asked O'Bryan what had caused Bly to "get so frustrated," she said she did not know— that was why she had been trying to contact him. (Tupman Dep. 188–89.) Tupman also reminded

O'Bryan that she had said, when they met in Kansas City, that she "felt bad" about the conversation with Bly and asked again why she had felt bad. O'Bryan responded that she felt bad that she had clearly upset him, but she did not remember why he was so upset. (Tupman Dep 189; *see also* Doc. No. 95-2, at 117.)

According to Tupman, O'Bryan asked her why she was asking all these questions, and Tupman told her that she was struggling because the version of the incident that she was hearing from O'Bryan then was different from what she had told her when they were in Kansas City. (Tupman Dep. 190.) O'Bryan told Tupman that, if she had said what she was accused of saying, she would tell Tupman that.

### D. The Plaintiff's Version of Events

The plaintiff disputes many of the details of the defendant's version of events. First, according to O'Bryan, Ray's notes do not "exactly" match up with her recollection of their conversation. She said she was "trying to find a lot of different ways to say no because I said that and it wasn't good enough." (O'Bryan Dep. 144.) She also affirmatively testified in her deposition that she did not use profanity during the conversation with Bly, and she absolutely denied telling Bly that he should go "fuck another banker or words to that effect." (O'Bryan Dep. 139.)

O'Bryan testified that, when she learned of Bly's complaint from Charla Ray, she immediately reached out to Tupman. According to O'Bryan, when they spoke on the phone, she "shared with Faith [Tupman] the conversation that [she] had with Charla [Ray]." (O'Bryan Decl. ¶ 35.) O'Bryan claims that Tupman told her she had not heard about the incident but would look into it and get back to her. O'Bryan claims she did not hear back from Tupman until the meeting they had at O'Bryan's office the day before her termination. (O'Bryan Decl. ¶ 35.)

O'Bryan claims that, when they interviewed her, both Ray and Tupman "badgered" her repeatedly about whether she had "used the 'f' word at Ryan Bly." She denies saying she could not remember and instead states that she affirmatively told both of them that she did not use the "f" word in her conversation with Bly. They insinuated that she was lying. (O'Bryan Decl. ¶ 37.) O'Bryan denies telling Tupman that she had a "not so great discussion" with Bly. (O'Bryan Decl. ¶ 38.) She denies that Tupman ever relayed to her that she was "struggling" because the plaintiff's "version of the story allegedly differed from that shared in Kansas City." (*Id.* ¶ 40.) The plaintiff insists that her statements to Ray and Tupman were consistent from start to finish.

The plaintiff claims that, during her last meeting with Tupman, Tupman asked her to "give her the details and why [O'Bryan] thought Ryan yelled" at her. (O'Bryan Dep. 145.) The plaintiff stated: "I felt like I had pushed his buttons. That he was constantly complaining about Elza. I didn't think that was the right environment for him to do that. . . . And I would just say, finally, you know, Ryan, if you're not happy here, why are you here? Why don't you go work somewhere else?" (*Id.* at 145–46.) O'Bryan told Tupman that she "thought he showed his typical anger and immaturity and volatility and screamed because [O'Bryan] wasn't giving him the answers that he wanted or the attention that he wanted." (*Id.* at 146.) Tupman told O'Bryan she did not believe her. (*Id.* at 145.) According to O'Bryan, at the November 7 meeting, Tupman and Jonathan Miller would leave the room, come back, and then ask her the same questions all over again, to which she would give the same responses. They "pushed [her] to become emotional." (*Id.*) She reiterated to them that she did not feel she had done anything wrong. (*Id.*)

The plaintiff claims that Ray and Tupman took Bly's and Straw's version of what happened "as though it were gospel," even though Bly and Straw had "substantial bias against Plaintiff that Defendant did not investigate or consider." (Doc. No. 105, Pl.'s Statement of

Disputed Facts No. 32.) The citations the plaintiff supplies in support of this statement do not support it. Tupman testified simply that she had no reason to believe that Straw, Bly, or Elsen was untruthful when Ray interviewed them about the incident. (Tupman Dep. 269–70.) While the plaintiff testified that she had been asked to lead an investigation of allegations against Straw by another employee, and she characterized Bly as emotional and volatile (O'Bryan Dep. 140), she does not point to facts showing that Tupman knew or should have known that Straw and Bly were "biased" to the point of conspiring to make up a story about what actually happened between Bly and O'Bryan. Likewise, she claims that US Bank "never questioned Bly's or Straw's motives" (Doc. No. 105, Pl.'s Statement of Disputed Facts No. 33), but she does not indicate why it should have.

The plaintiff further objects to Ray's Summary of Investigation, which was created after the plaintiff's termination, insofar as it falsely states that O'Bryan "could neither confirm nor deny" using profanity or making the statement to Bly, "if he was so unhappy why didn't he go to another region & 'fuck' their bankers?" (Doc. No. 106-6, at 112–13.) As set forth above, the plaintiff maintains that she told Ray and Tupman that she did not make that statement or use profanity. Regardless, there is no evidence that Tupman relied on Ray's summary in making her decision.

### E.    O'Bryan's Termination

Tupman, as O'Bryan's direct supervisor, was ultimately responsible for the decision to terminate O'Bryan. (Tupman Dep. 10.) Tupman stated that she would have consulted with her supervisor, Jonathan Miller, and with Charla Ray "for guidance . . . in [the] thought process." (Tupman Dep. 205.) She recalled that she talked to Mike Martin, who, like Tupman, was an Associate District Manager, about the matter at some point, but she would not have asked Martin

what to do, as it was her decision. (Tupman Dep. 207–08.)[9] Ultimately, Tupman made the decision to terminate O'Bryan because of her perception that O'Bryan had told different versions of the story on the occasions she talked with her about the incident and because of the lack of leadership she had displayed in her interaction with Bly. (Tupman Dep. 197-98; *see also* Tupman Dep. 195 ("Jennie gave me two different versions of the story so it was a bit hard for me to understand or maybe trust her."); *see id.* at 197 ("As a leader, we get paid to create a different environment. . . . I do not believe she created that environment. . . . I'm saying the environment Jennie created was one – not one that I was pleased with.").) Tupman also made it clear that she did not consider cursing, *per se*, to give rise to a respect or ethics issue. (Tupman Dep. 155.) She also distinguished between using a curse word and "cuss[ing] at a person." (*Id.*) She testified that she considered O'Bryan a friend (*id.* at 70–71) and that terminating her was "not an easy decision" (*id.* at 203). Tupman notified O'Bryan of her termination on November 8, 2018.

The plaintiff received a Separation Notice on the date of her termination stating that she was terminated for "policy violation"; she received a second Separation Notice three months after litigation was underway that stated that she was terminated for "Misconduct/Violation of Policy." (O'Bryan Decl. ¶¶ 43–44.)

---

[9] The plaintiff purports to dispute this and claims that Mike Martin was somehow involved in the decision. She states in her Declaration that Tupman and Mike Martin "worked collaboratively on issues affecting their teams" and that Martin "admitted meeting with Tupman to discuss the termination," as a result of which O'Bryan "believe[s] both were responsible for terminating her employment." (Doc. No. 106-2, O'Bryan Decl. ¶ 42.) Martin, in fact, testified that Tupman did not advise him or keep him up to date regarding the progress of events after she became aware of the incident. (Martin Dep. 222.) She used him as a "sounding board" at one point, when she was "laboring over" whether to terminate O'Bryan. (Martin Dep. 285–86.) Martin advised her not to. The plaintiff's subjective and unsubstantiated belief that Martin was involved in the decision-making process does not constitute evidence. The court finds, therefore, that the plaintiff has not succeeded in showing an actual disputed fact as to whether Tupman was the person who made the decision to terminate O'Bryan's employment, regardless of whether this fact is material.

In the days just after the plaintiff's termination, Tupman sent or forwarded two emails to HR relating to the plaintiff's performance. (Tupman Dep. 259–64.)[10]

The plaintiff was replaced by Carlana Brown, whose date of birth is May 5, 1975. (Hegna-Versluis Decl. ¶¶ 2–3.) The plaintiff's date of birth is November 24, 1965. (O'Bryan Dep. 11.)

## III.     STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

---

[10] The plaintiff claims that Tupman "continued to paper the file" in an attempt to "validate 'pretextual' concerns" about O'Bryan after her termination. (Doc. No. 105, Pl.'s Statement of Disputed Facts No. 26.) This statement is one of opinion, not fact, and the citations to Tupman's deposition do not support it. Moreover, although the plaintiff cites the emails themselves (which were made exhibits to Tupman's deposition), the emails do not appear to have been filed with either party's summary judgment documents.

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## IV.    DISCUSSION

The defendant seeks summary judgment as to all of the plaintiff's remaining claims. The plaintiff has expressly abandoned her Title VII sex discrimination claim. The court has also found that claims based on adverse employment events that took place in 2017 are time-barred, in addition to which the plaintiff expressly acknowledged that the only adverse action upon which her discrimination and retaliation claims are premised is her termination. Consequently, the only remaining claims to be addressed are the plaintiff's Title VII and ADEA retaliation claims and her ADEA discrimination claim, all premised upon her termination in November 2018.

### A.    Retaliation Claims

Retaliation claims under both Title VII and the ADEA that are premised upon circumstantial rather than direct evidence are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under this framework, the plaintiff carries the initial burden of establishing a *prima facie* case of retaliation. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802) If—and only if—she can do so, the burden then

shifts to the defendant, who must "articulate some legitimate, non-discriminatory reason for [its] actions." *Id.* (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). If the defendant meets this burden, the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 804–05).

### 1. Prima Facie Case of Title VII Retaliation

To establish a *prima facie* case of retaliation under Title VII, O'Bryan must show that "(1) [she] engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *George*, 966 F.3d at 459 (quoting *Laster*, 746 F.3d at 730).

The plaintiff argues here that she has established the existence of material factual disputes as to whether she engaged in protected activity when she complained to Hegna-Versluis about Mike Martin's discriminatory treatment of her in 2016 and as to whether Martin, at least, knew about her complaints. Regarding causation, she argues that the two-year time lapse between her complaint and her termination is "not fatal to her claim." (Doc. No. 103, at 27.) She also contends that there is evidence from which it may be inferred that Martin influenced Tupman's decision to terminate her. From this, she appears to be arguing that, because Martin was in a position to exercise influence over the termination decision, causation can be inferred.

Even accepting the truth of the plaintiff's assertions that she engaged in activity protected by Title VII and that Martin knew about it, the court finds that the plaintiff cannot establish a causal connection between her protected activity in 2016 and her termination in late 2018. To establish the causal connection element of a *prima facie* case of retaliation, a plaintiff must adduce sufficient evidence from which a reasonable inference can be drawn that the adverse

action would not have been taken if the plaintiff had not engaged in protected activity. *Nguyen*, 229 F.3d at 563. No one dispositive factor is required to establish a causal connection; however, evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Id.* The plaintiff must present *some* evidence giving rise to an inference that there is a causal connection between the events; "the mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." *Balmer v. HCA, Inc.*, 423 F.3d 606, 615 (6th Cir. 2005).

The plaintiff has not presented evidence sufficient to establish causation. First, nothing in the record, aside from the plaintiff's speculation, supports an inference that Martin exercised any influence over the decision to terminate O'Bryan. Martin testified that he told Tupman she should *not* fire O'Bryan during the one conversation when Tupman used him as a "sounding board." (Martin Dep. 286.) Tupman testified that she did not ask for Martin's input and that the decision was hers alone. (Tupman Dep. 207–08.) Moreover, even if Martin had recommended terminating the plaintiff, such a suggestion, coming two years after the plaintiff's alleged complaint about Martin's discriminatory conduct, would not be sufficient to give rise to an inference of causation, in the absence of any other evidence of a causal connection between these events.

Because the plaintiff has not established a *prima facie* case of Title VII retaliation, the defendant is entitled to summary judgment on that claim.

### 2. Prima Facie Case of ADEA Retaliation

The elements of a *prima facie* ADEA retaliation claim are the same as for Title VII retaliation, except the plaintiff must show that she engaged in activity protected by the ADEA.

US Bank argues that the plaintiff cannot show that she engaged in protected activity or that there is a causal connection between the protected activity and her termination. The court finds that there is a factual dispute as to whether the plaintiff engaged in protected conduct, but O'Bryan has not produced evidence of a causal connection between such conduct and her termination.

The plaintiff claims that she complained directly to Tupman that she was being treated differently than younger employees in the "July, August time frame." (O'Bryan Dep. 126–27.) The plaintiff claims that the three- or four-month time interval between her "complaint" and her termination, coupled with Tupman's other actions through which she sought to "build a case" against the plaintiff by accusing her of "incentive fraud" and abuse of the expense policy is sufficient to establish a causal connection between these events. The defendant responds that the temporal distance between the alleged complaint and the adverse action is not sufficiently close to give rise to an inference of causation, standing alone, and that the plaintiff has failed to point to any other evidence of causation.

The Sixth Circuit "has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)). Under the particular facts of this case, where the plaintiff's alleged protected conduct is somewhat vague and the approximate date on which it occurred is even more vague, the court finds that the three- or four-month time span between the alleged protected activity and the adverse action is not sufficiently close to support an inference of a causal connection between these events. *Accord Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) (noting that "a roughly 75-day delay between [the

plaintiff's] protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation"). While it is true that "close temporal proximity" coupled with other evidence, including, for example, "evidence of heightened scrutiny," may satisfy the plaintiff's burden on causation at the *prima facie* stage, *id.* (citing *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir. 2009)), the other actions to which the plaintiff points—which involved being criticized or corrected by Tupman but did not involve disciplinary action—do not actually establish heightened scrutiny or, indeed, qualify as additional evidence of causation.[11]

The plaintiff has not established a *prima facie* case of ADEA retaliation, and US Bank is entitled to summary judgment on this claim.

### B. ADEA Discrimination Claim

The ADEA, of course, prohibits an employer from terminating an individual because of her age. 29 U.S.C. § 623(a)(1). A plaintiff bringing an age discrimination action under the ADEA has the burden of proving—through either direct or circumstantial evidence—that her age was the "but-for" reason for her termination. *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020) (citing *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 177 (2009)).

#### 1. Direct Evidence

Direct evidence is evidence that, "if believed, requires the conclusion that age was the 'but for' cause of the employment decision." *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 530 (6th Cir. 2014). Direct evidence "proves the existence of a fact without requiring any inferences." *Id.* (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th

---

[11] In *Kenney*, the Sixth Circuit described "heightened scrutiny" as typically involving a "three-step pattern": (1) an employee engages in conduct that is "technically objectionable" but is tolerated by the employer; (2) the employee engages in protected conduct; and (3) "the employer then takes an adverse action against the employee for conduct the employer had previously allowed." *Kenney*, 965 F.3d at 449 (citations omitted). The plaintiff does not allege this type of pattern.

Cir. 2004)).

O'Bryan asserts that she has direct evidence sufficient to establish an ADEA violation, pointing to her allegations that, in the spring of 2018, Tupman told her that her unfashionable wire-rimmed glasses made her look like "an old lady" and that she needed to "get with the times." (O'Bryan Dep. 78–79.) On her next trip to Nashville, around June 2018, Tupman commented that she "felt good energy from younger members" of their team and advised O'Bryan to "get with the younger crowd" and "learn" and that, if she "just want[ed] to be an old RM [Regional Manager]," she would not "last very long." (*Id.* at 80.) On a conference call with O'Bryan and others that took place shortly after that visit, Tupman stated that she was going to send one of the younger team members to Nashville to "see if he could teach an old dog new tricks," referencing new software the bank was getting. (*Id.* at 81.)

While these statements may qualify as indirect evidence of age discrimination, they do not qualify as direct evidence, because the plaintiff has made no showing that the statements were proximate in time to her termination or had any connection with the decisional process that led to her termination. *Accord Scola v. Publix Super Markets, Inc.*, 902 F. Supp. 2d 1083, 1092 (E.D. Tenn. 2012) (finding that a manager's referring to the plaintiff as an "old lady" was not direct evidence of age discrimination where there was no showing that the statements had any connection to the decisional process), *aff'd in part*, 557 F. App'x 458 (6th Cir. 2014). Thus, even if the jury accepts as a factual matter that Tupman made these statements, that determination would not "require[] the conclusion" that age discrimination was the "but-for" cause of her termination. *See Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) (reiterating that "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age," constitute direct evidence of discrimination (internal quotation

marks and citation omitted)).

Under these circumstances, Tupman's isolated comments do not qualify as direct evidence of age discrimination.

### 2. Circumstantial Evidence – The Plaintiff's Prima Facie Case

Like retaliation claims in the employment context, age discrimination claims that depend on circumstantial evidence are subject to the *McDonnell Douglas* burden-shifting analysis described above.

"To establish a *prima facie* claim of age discrimination under the ADEA, a plaintiff must show that: (1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger worker." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007) (citations omitted). As for the fourth element, the plaintiff must show that she was replaced by a significantly younger employee to support an inference of discrimination. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). A difference of six years or less will not be considered significant, while a difference of ten or more years will be considered significant. *Id.* at 284. Differences of more than six but less than ten years must be considered on a case-by-case basis. *Id.*

The defendant argues that the plaintiff cannot establish a *prima facie* case of age discrimination, because she has not shown that she was replaced by someone outside her protected class. (Doc. No. 96, at 12–13.) As set forth above, that is not the correct standard in the ADEA context. The evidence establishes that the plaintiff was replaced by an employee who was nine and one-half years her junior. For purposes of the plaintiff's *prima facie* case, this age difference is sufficient to give rise to an inference of age discrimination.

### 3.  Pretext

US Bank also argues that it has proffered a legitimate, non-discriminatory reason for the plaintiff's termination and that the plaintiff cannot establish that its reason is pretext for discrimination. A plaintiff typically shows pretext in one of three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action." *Miles*, 946 F.3d at 888 (citation omitted). The Sixth Circuit has recognized that these three categories are not the exclusive means of establishing pretext; they are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.* (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)).

Generally, "[i]f an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (*i.e.* the adverse action), then the employee will not be able to establish pretext." *Tingle*, 692 F.3d at 530–31 (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)); *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext[.]"). The basis of this honest belief must come from particularized facts that were before the employer when the decision was made, allowing the employer to make a "reasonably informed and considered decision before taking an adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). To overcome this honest belief and demonstrate pretext, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the employer's explanation and instead infer that the defendant intentionally discriminated against her. *Id.* at

493. Merely disputing the facts is not sufficient; rather, the plaintiff must produce evidence "demonstrat[ing] that the employer did not 'honestly believe' in the proffered nondiscriminatory reason for its adverse employment action." *Id.* at 494.

US Bank has offered a legitimate, non-discriminatory reason for the plaintiff's termination. Tupman testified that she made the decision to terminate O'Bryan (1) because of her perception that O'Bryan had relayed differing versions of the incident involving Bly on the occasions she talked with Tupman about it and (2) because O'Bryan displayed a lack of leadership in her interaction with Bly. (Tupman Dep. 197.) Tupman characterized the decision as based on her conclusion that O'Bryan's conduct violated US Bank's code of ethics as it related to workplace respect. (Tupman Dep. 10.) Anticipating the plaintiff's argument that US Bank's reason for her termination has no basis in fact, because she disputes Bly's and Straw's versions of what actually occurred, US Bank asserts that the "honest belief" rule insulates it from liability, regardless of what actually happened between O'Bryan and Bly. (Doc. No. 96.)

The plaintiff, however, does not merely dispute what happened between her and Bly. In addition to her fundamental dispute regarding the details of that incident, she disputes Ray's and Tupman's assertions that her story changed over time and that she was ever equivocal about what she had said to Bly. The plaintiff asserts that Ray and Tupman "badgered" her to say that she had engaged in inappropriate conduct, despite her repeated denials, and that they falsely claimed that her story changed over time. (O'Bryan Dep. 139, 142–44; O'Bryan Decl. ¶¶ 36–37.) O'Bryan also denies other parts of Ray's and Tupman's versions of their conversations with O'Bryan. She specifically disputes that she ever told Tupman that she had not followed the "two-drink rule" or suggested in any way that she had consumed too much alcohol on the evening in question; she denies that Tupman ever said to her that she (Tupman) was "struggling" because of

her perception that the plaintiff's version of events had changed; and she denies ever saying that she does not usually "black out" or otherwise suggesting that she had "blacked out" on the evening in question. (O'Bryan Decl. ¶¶ 37–40.)

Part of Tupman's stated rationale for terminating the plaintiff is that she felt the plaintiff was not honest with her about what had happened, and the purported basis for her conclusion that O'Bryan was dishonest was that her version of what had happened changed over time. The plaintiff, however, disputes the basis for that conclusion, insofar as she denies that her version of the story ever changed. Accordingly, the court finds that the plaintiff has established the existence of a material factual dispute as to the truth of at least part of US Bank's proffered reason for the plaintiff's termination. The plaintiff, that is, has pointed to evidence that calls into question whether Tupman made a "reasonably informed and considered decision before taking an adverse employment action." *Braithwaite*, 258 F.3d at 494. If the jury believes the plaintiff's version of what she told Tupman, it could also find that the plaintiff has "demonstrat[ed] that the employer did not 'honestly believe' in [at least part of] the proffered nondiscriminatory reason for its adverse employment action." *Id.* In addition, by calling into question the validity of the defendant's proffered rationale for disbelieving the plaintiff, the plaintiff also calls into question the reasonableness of Tupman's decision to credit Bly's and Straw's version of events over O'Bryan's.

To be sure, the plaintiff's evidence is thin. Her focus on US Bank's witnesses' equivocal testimony regarding the bank's policy about the use of the word "fuck" in the workplace is misplaced, because there is no evidence that she was terminated for using the word "fuck." Rather, Tupman's focus was on the allegedly disrespectful context in which the word was used, in a way that did not reflect well on O'Bryan as a manager. O'Bryan's argument about US

Bank's failure to investigate alleged bias on the part of Straw and Bly, which purportedly arose because O'Bryan had recommended Straw's termination, is also off-point, insofar as there is no evidence that Straw or Bly knew that the plaintiff had made that recommendation. The plaintiff also complains that Ray's summary of her investigation intentionally omitted reference to the fact that the plaintiff denied the allegations against her, but Ray was not the decisionmaker, and there is no evidence that Tupman relied in any way upon Ray's written summary. The plaintiff also claims that she received two notices providing differing rationales for her termination, but the two notices, on their face, are not conflicting. Finally, the plaintiff has failed to present evidence in support of her assertion that Tupman continued to "paper the file" with additional documents even after the plaintiff was terminated.

Regardless, because the plaintiff has presented evidence sufficient to create a material factual dispute as to the defendant's honest belief in the reason(s) for the adverse employment action, US Bank is not entitled to summary judgment on Tupman's ADEA discrimination claim.

## V. CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the Motion for Summary Judgment. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge